## UNITED STATES DISTRICT COUR
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.: 1:18-CR-360 (CKK) |
| v. | ) | |
| | ) | FILED UNDER SEAL |
| ABDUL AMAN, | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Abdul Aman, through counsel, respectfully submits this Sentencing Memorandum setting forth factors that the Court is being asked to consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

## I.     PROCEDURAL POSTURE

The government filed a two-count indictment in the District of Maryland on about November 7, 2018. Defendant voluntarily reported to the district court to answer those charges on November 8, 2018. Shortly thereafter, he and the government agreed to a change of venue to this Court, and the District of Maryland transferred the prosecution of his case to this Court later that same month, on about November 19, 2018.

Mr. Aman signed a plea agreement with the government on December 6, 2018. He promptly entered a plea of guilty to a one count superseding Information on January 3, 2019. Mr. Aman's plea agreement contemplated his cooperation and his sentencing was delayed while he worked with the government on its investigation of his former employer, FedSys, a government contractor that, when Mr. Aman's worked there in from about March 2011 to May 2012, functioned as a subcontractor to another government contractor, Mission Essential Personnel ("MEP"). The government suggests that its investigation of the activity that brings Mr. Aman to this Court "will yield additional charges [against other subjects] in the future." Gov't Mem. p. 6.

## II.     PLEA AGREEMENT SUMMARY

Mr. Aman agreed to plead guilty to 18 U.S.C. § 371. In addition, he agreed to pay a $100.00

special assessment to the Clerk, United States District Court for the District of Columbia.

The factual basis for Mr. Aman's conviction was not included in the plea agreement, but was separately set forth in a statement of undisputed facts to which Mr. Aman admitted. These undisputed facts were also the foundation of his Rule 11 colloquy.

In signing the Plea Agreement, Mr. Aman acknowledged the punishment he could receive, waived his trial rights, and provided other acknowledgments.

The parties agreed to jointly recommend the following Base Offense Level, Specific Offense Characteristics, Adjustments, and Departures:

| Base Offense Level | +6 |
|---|---|
| Specific Offence Characteristics; Loss Greater than $40,000 | +6 |
| Acceptance of Responsibility | -2 |

This provides an Offense Level of 10 under the United States Sentencing Guidelines. The parties agreed that pursuant to U.S.S.G. 5E1.2, the estimated applicable fine range for a level 10 offense is between $4,000 and $40,000. Mr. Aman was not required to agree to pay a fine, however, and in its Memorandum in Aid of Sentencing the government has not recommended imposition of any fine as part of Mr. Aman's sentence. Nor has the government recommended that any restitution be paid to any victim. Undoubtedly, this is due to the fact that the company that paid bonuses to Mr. Aman for his having recruited potentially unqualified translators, FedSys remains under investigation for its own misconduct.

Given Mr. Aman's lack of ability to pay any fine or any restitution, he respectfully requests that neither a fine, nor restitution, be imposed.

III.   **PRESENTENCE REPORT**

Mr. Aman participated in a presentence interview on June 21, 2019. A Presentence

Investigation Report was prepared and disclosed to the parties on July 30, 2019. The government

suggested no revisions to the PSIR; Defendant's Objections/Clarifications to the PSIR were noted

and incorporated into the revised PSIR disclosed on August 29, 2019.

In its initial iteration, the PSIR adopted a Criminal History Category of III even though it

also suggested a point tally of seven (which point tally suggested a Criminal History Category of

IV). The government highlighted this issue in footnote 1 of its sentencing memorandum. On

September 5, 2019 (subsequent to the August 29, 2019 issuance of the PSIR), the U.S. Probation

Officer who drafted the PSIR sent an email to counsel for both parties in which she indicated:

> We wanted to notify you both of mistake in our final PSR – specifically, Paragraph 45 was
> incorrectly scored – we believe it should not have received criminal history points because
> the charge description fits more under 4A1.2(c)(1), there was no jail time imposed, and the
> defendant was convicted in absentia. Therefore we believe the correct criminal history
> score is 6 and the correct criminal history category is III. We are sorry for any confusion
> this has caused.

Although the PSIR places Mr. Aman in a Criminal History Category III, Mr. Aman's

criminal history classification results entirely from several instances (including one from when he

was 20 years old and another from when he was 26 years old) where Mr. Aman misused alcohol.

He clearly overindulged in alcohol at times during his twenties, and he also tested positive for use

of marijuana when he reported to federal court in Baltimore on November 8, 2018. But for the

past five years Mr. Aman has had no issues with alcohol and, since November 2018, he has

remained compliant with every release condition imposed—including the requirement to avoid use

of any illicit drugs. A Criminal History Category of III, based entirely on non-recent misuse of

alcohol, overstates his dangerousness and any likelihood of his recidivism.[1]

---

[1] The policy statements set forth in § 4A1.3 of the Sentencing Guidelines (Departures Based on
Inadequacy of Criminal History Category) (Policy Statement)) invite departures for over-

The PSIR agrees that Mr. Aman should receive a two-point reduction for acceptance of responsibility, leaving him with a total adjusted offense level of 10. Based on that calculation and the conclusion that he qualifies for a Criminal History Category of III, the PSIR concludes that Mr. Aman falls into a Guidelines Zone C, and therefore suggests that Mr. Aman is ineligible for probation. *See* PSIR ¶ 101.

In fact, however, as a result of Mr. Aman's cooperation with the government, after the PSIR was completed the government filed a motion pursuant to USSG 5K1.1 for a departure from the Guidelines (as part of its Sentencing Memorandum). As a result of Mr. Aman's provision of substantial assistance in the government's investigation into contract fraud committed by others, the advisory Guidelines do not stand in the way of Mr. Aman's eligibility for probation. Sentencing Mr. Aman to several months of incarceration for an offense committed over eight years ago, when he was about 28 years old, would not comport with federal law or common sense.

### IV.    LEGAL STANDARDS

Section 3553 of Title 18 of the United States Code sets forth the Federal sentencing structure. Section 3553(a) of the Sentencing Reform Act of 1984 ("SRA" or "Sentencing Reform Act") requires sentencing courts to "impose a sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in" the SRA. (emphasis added). The Eleventh Circuit has described this "parsimony principle" as the "Goldilocks" principle: "A more accurate term, if one is needed, might be "the Goldilocks principle," because the goal is to lock in a sentence that is not too short and not too long, but just right to serve the purposes of Section 3553(a). *United States v. Irey*, 612 F.3d 1160, 1197 (11th Cir 2010). *Accord*, *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (referring to sentencing purposes of § 3553(a) as "a tapestry of

representation or under-representation of criminal history, authorizing a downward departure if a defendant's criminal history overstates the seriousness of his past criminal record or the likelihood that the defendant will commit other crimes.

factors, through which runs the thread of an overarching principle" that is "sometimes referred to as the 'parsimony principle' ") (citing *Kimbrough*, 552 U.S. at 101); *United States v. Borho*, 485 F.3d 904, 912 (6th Cir. 2007) ("[T]he guidepost for sentencing decisions post-*Booker* is the 'parsimony requirement[.]' "); *cf. United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006) ("Selection of an appropriate amount of punishment inevitably involves some degree of subjectivity that often cannot be precisely explained."). *See also* Richard S. Frase, *Sentencing Guidelines in the States: Lessons for State and Federal Reformers,* 6 Federal Sentencing Reporter 123, 124 (1993).

The Sentencing Reform Act's stated purposes are for federal sentences:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2). In determining the sentence minimally sufficient to comply with these purposes, sentencing courts are instructed to consider the several factors listed in Section 3553(a). These are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; . . . (3) the kinds of sentences available; (4) [the Sentencing Guidelines]; (5) [the Sentencing Commission's policy statements]; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1), (a)(3)-(a)(7).

For a time, one of these factors, the Sentencing Guidelines, drove most sentences. In *United States v. Booker,* 543 U.S. 220 (2005), however, the Supreme Court ruled that the Sixth Amendment, as interpreted by the Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), mandates that the Sentencing Guidelines cannot operate as mandatory sentencing rules. Post

*Booker*, the Guidelines are to be considered like each other factor: they are an advisory part of any calculus. *United States v. Tann,* 532 F.3d 868, 874 (D.C. Cir. 2008). Subsequent Supreme Court decisions have affirmed the authority of the district courts to sentence defendants within the range of available choices, dictated by the facts and circumstances of each case before the court.[2] In *Rita v. United States*, 551 U.S. 338, 351 (2007), the Supreme Court made clear that a district court may consider arguments that "the Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a)'s considerations." While the Court must give respectful consideration to the Guidelines in determining a sufficient sentence, *Gall v. United States,* 552 U.S. 38, 49-50 (2007), it may not presume that a Guidelines sentence is a correct one. *Rita,* 551 U.S. at 351. *See also Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (noting that sentencing courts may vary from advisory Guidelines range based solely on policy considerations, including disagreement with policy underlying Guidelines). *Accord United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008) ("The central teaching of *Gall* is that the Guidelines are truly *advisory*.")

## V.    **APPLICATION OF LEGAL STANDARDS**

A detailed assessment of the Section 3553 factors is set forth below in order to assist the Court in fashioning Mr. Aman's appropriate sentence. In this case, the factors articulated herein weigh strongly in favor of a probationary sentence requiring Mr. Aman to become gainfully employed again and to so remain, while also remaining free from use of illicit drugs.

---

[2] *Booker* breathed new life into 18 U.S.C. § 3661, too, which requires that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *United States v. Jones*, 531 F.3d 163, 173 n.6 (2d Cir. 2008) (quoting § 3661). Thus, "factors disfavored by the Sentencing Commission may [now] be relied on by the district court in fashioning an appropriate sentence." *United States v. Munoz-Nava*, 524 F.3d 1137, 1148 (10th Cir. 2008) (citing *Gall*).

A.    **The Nature and Circumstances of this Offense and the History and Characteristics of Mr. Aman Warrant a Probationary Sentence (18 U.S.C. § 3553(a)(1)).**

1.    **Nature and Circumstances of Offense.**

Abdul Aman has a facility for languages. He speaks six: Pashto, Dari, Hindi, Urdu, Farsi and English. Before his hiring by FedSys in 2010, Mr. Aman had been working with a subcontractor paid to train U.S. soldiers on how to interact effectively with the population in Afghanistan. In 2010, he was recruited by FedSys, a government contractor that, for purposes of this matter, also functioned as a subcontractor working with prime contractor Mission Essential Personnel ("MEP"). MEP was the United States Army's prime contractor for supplying linguists to serve as translators in support of the Army's operations in Afghanistan.

MEP paid FedSys and a number of other subcontractors to identify and recruit linguist candidates who were: (1) able to speak Dari and Pashto (the two primary languages spoken in Afghanistan), and (2) also willing to work with Army personnel *in Afghanistan*. Before recruits were accepted by MEP for follow-up testing and training at MEP's Pre-Deployment Processing Center in Linthicum, Maryland, they were required participate in an "Oral Proficiency Interview" ("OIP"). MEP employed the OIP as its mechanism for initially screening potential candidates for further testing and training at its own facility in Maryland. *See* Factual Basis for Plea, ¶6.

While working with a different government contractor to teach U.S. soldiers about Afghan habits and customs, a FedSys recruiter reached out to Mr. Aman about his interest in working alongside the U.S. military, through MEP's prime contract, as a FedSys linguist. Mr. Aman explained that while he was proficient in the two requisite Afghan languages, he could not return to Afghanistan because the security concerns that had caused his family to flee Afghanistan in 2004 continued to exist for him there. After several additional discussions with FedSys, in May of 2010, FedSys hired Mr. Aman as a recruiter for language services. This was his first job working in

7

an office and he was also new the recruiting business. Not only was Mr. Aman new to this line of work, he had no experience using office computers and office software, and no experience even completing and filing paperwork. Mr. Aman was overwhelmed while trying to learn the structure and processes within FedSys.

After completion of his first month, the upper echelon and employees in FedSys's linguist recruiting operation started teasing Mr. Aman for being unable to recruit any linguist candidates. Next to his name on a board someone drew a large zero and his coworkers and managers called him "Donut," not Abdul. He was told he name would now be "Donut" because a donut looks like him, like a big zero. Parentless for years and still trying to fit into his new job and his new county, a bright but unsophisticated 26-year-old was being bullied by adults twice his age who should have offered him their good mentoring.

While still trying to adapt to FedSys, Mr. Aman was brought into the office of his immediate supervisor, on several occasions, and told he would be fired if he did not figure out—and figure out soon—"how to recruit" at FedSys. His supervisors did not teach him how to recruit, instead leaving it to Mr. Aman to observe what other recruiters were doing to secure candidates. Mr. Aman watched other recruiters guarantee "their" candidates certain plum assignments (even though FedSys knew linguists' assignments were based on their qualifications and the Military's needs). He also discovered how other FedSys recruiters helped "their" candidates pass the initial verbal screening test given to each FedSys candidate over a telephone. He heard his coworkers tell candidates who did not speak one of the needed languages well, or well enough, to allow a more conversant family member to impersonate the candidate during the telephone test.

After Mr. Aman observed these other recruiters' techniques, he was called into yet another meeting with his managers and told he would be fired if he did not start acquiring new linguist

candidates for FedSys. He was told by his managers that had no reason to be unable to fulfill his duties as a recruiter because he spoke both needed native tongues, Pashto and Dari, and spoke decent English. Mr. Aman told his managers he knew other recruiters' candidates where getting help for their language screening tests in order to process further, in order to get candidates invited to MEP' Pre-Deployment Training Center near Baltimore, MD.

When Mr. Aman spoke to management about what other recruiters were doing to circumvent screening that might disqualify their candidates, his immediate manager told Mr. Aman the manager was unaware of any such concern. The supervisor told Mr. Aman to "Get the f___ out of my office." Meanwhile, Mr. Aman continued to see other recruiters go into this same supervisor's office. He heard them ask the supervisor to change contact phone numbers of these other recruiters' candidates. Soon, he came to understand, and came to understand that his supervisor also understood, that other candidates' contact numbers were being substituted for phone numbers of individuals ready to stand-in for initial telephonic screening tests. Phone numbers were being changed, when recruiters thought it advisable, so the linguist test calls were routed away from questionable candidates and toward individuals with good foreign language skills. After post test results were secured, recruiters would go back their manager's office to insert the candidates' actual phone numbers back into the candidate's file. Management controlled access to those files.

Through observation how these other recruiters were rewarded with promotions, were permitted relaxed work schedules (coming and leaving as they pleased), and after seeing how these others were never reprimanded, but instead praised, Mr. Aman discovered he to "work within the FedSys system" while never openly discussing the work around. Mr. Aman came to adopt the techniques his coworkers used and he started getting credit for new hires. His supervisors were congratulating him on a daily basis. Suddenly, FedSys doubled his pay.

After MEP rejected several unqualified linguists FedSys had referred, Mr. Aman felt comfortable enough with his position at FedSys to ask his management why FedSys wasted its time and effort on referring unqualified candidates. His management's response was the same as it had been during Mr. Aman's first month there: "I didn't see anything, I didn't' hear anything, get out of my office." Mr. Aman's concern about how FedSys operated led him to search for a new job. He quickly found one at another MEP subcontractor, Acclaimed Technical Services ("ATS"). He interviewed there and was offered a job on the spot for a yearly salary of $72,000, meaning he would make $22,000 more per year than he was making at FedSys. When he returned to FedSys to give his two-week notice, FedSys management told him he could not leave. Mr. Aman was told by his management that FedSys would sue him and ATS for breach of contract if he left to work for ATS. Mr. Aman was told (falsely he now believes) that under contract law he "had to get fired in order to leave the company." FedSys also told him it would do something to make him happy, to keep him happy. Within days, FedSys said he was being promoted to Senior Lead Recruiter and that he would now be paid $75,000 per year (plus bonuses). Believing the threat to sue him if he left for ATS was real, Mr. Aman agreed to stay despite his concerns. But he told his supervisor (he had the same supervisor, despite Mr. Aman's apparent promotion), that he would no longer participate in OPI testing substitution.

Several months after his "promotion" to lead recruiter, Mr. Aman was told by his direct supervisors that MEP had contacted the management of FedSys to complain about its linguist recruiting division. (MEP's complaint occurred after a FedSys recruit who failed MEP's testing told MEP officials she had never taken the initial OPI screening test before FedSys sent her to MEP.) Mr. Aman's managers told him FedSys corporate folks were in a panic about the issue and that investigators were headed to the linguist recruiting division's offices to speak with Mr. Aman about the accusations. (The rejected candidate had been one of his recruits.) Mr. Aman's managers

told him they were doing him a favor because they had been directed not to alert him to the company's internal investigation before his interview occurred. He was also told he should deny everything. Before the investigators arrived, two of Mr. Aman's managers told him he was a paranoid person who panicked easily, but it was important for him to keep calm, to reject the allegations about misconduct, and to follow-up with an email to HR that confirms his rejection of any allegations of misconduct. Before he sent that email his second-line supervisor, who knew it was false, reviewed it. His supervisors also told him to blame anything bad on the linguist recruiting divisions previous director who was severed from FedSys about seven months prior.

FedSys corporate fired Mr. Aman, but his immediate supervisors told him they had his back ad would get him rehired. When it became clear to him that he had been used as their scapegoat, he wrote an email to FedSys management outlining his awareness of the screening and recruiting misconduct that had occurred within the linguist recruiting division while he was there, including his involvement. This email sent May 25, 2012, effectively his confession, formed the basis for this prosecution. We understand the email also led to FedSys's subsequent housecleaning and MEP's decision to discharge FedSys as one of MEP's subcontractors for sourcing the Army's linguist supply contract.

## 2.    Characteristics of Mr. Aman.

After *Booker*, sentencing courts are now authorized to consider personal characteristics. *See Rita v. United States,* 551 U.S. 338, 364 (2007) (Stevens, J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider.").

A consideration of these matters weighs heavily against incarcerating Mr. Aman

and instead requiring that he obtain and maintain gainful employment while refraining from use of illicit drugs.

  Mr. Aman is now 35 years old. The activity at issue in this case occurred over eight years ago, when Mr. Aman was a much younger man, while he was employed at FedSys. (Mr. Aman was employed at FedSys for just over one year. His employment there ceased in May 2011.) Mr. Aman's activity was limited in scope and duration. After having been subjected to humiliation and shaming, Mr. Aman learned, through observing how others at FedSys were able to succeed, how he might also fit-in there.

  Mr. Aman understands that every other recruiter and manager in FedSys's linguist recruiting division was let go after he reported the scope of the misconduct to senior management. He also understands MEP fired FedSys as one of its subcontractors after Mr. Aman disclosed the scope of these others' direct activity or awareness of it.

  Mr. Aman accepts full responsibility for his poor decision making. His misrepresentation of several candidates' qualification was unusual for him in 2010 and unheard of for him now—totally inconsistent with the compassion he has shown throughout his life. He tried to escape from the company that channeled him into the criminal misconduct he committed until he left it in 2011. His involvement in the FedSys misconduct was an aberration for him even then, and now, given eight years of additional maturity, his misconduct will not ever reoccur.[3]

---

[3] Courts have imposed sentences below the Guidelines range where, as here, the offense conduct was an aberration and fundamentally at odds with defendant's life and character. *See United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (affirming downward variance where defendant committed "isolated mistake" in an otherwise "honorable and lawful life"); *United States v. Benkahla*, 501 F. Supp. 2d 748, 760, 761 (E.D. Va. 2007) (awarding downward variance based on defendant's "strong positive relationships with friends, family and the community"); *United States v. Cherry*, 366 F. Supp. 2d 372, 377 (E.D. Va. 2005) (awarding downward variance where letters reflected that offense was "an instance of poor judgment and aberrational behavior"); *United States v. Ranum*, 353

### B.   Confinement Will Not Further a Need for Adequate Deterrence or a Need to Prevent Further Crimes of the Defendant (18 U.S.C. §§ 3553(a)(2)(B) & (C)).

As discussed in "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (2004)," Mr. Aman's background and character show him to be at low risk for recidivism. (Taken from the World Wide Web on October 15, 2018 at https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines). He is also at a substantially lower risk of recidivating because of his criminal history category (pg. 8) and his age (pg. 12).

Moreover, the empirical evidence demonstrates that *there is no relationship between sentence length and general or specific deterrence, regardless of type of crime*. Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects…Three National Academy of Science panels...reached that conclusion, as has every major survey of the evidence."). David Weisburd *et al.*, Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment).

### C.   Incarceration Here Would Result in an Unwarranted Sentence Disparity Because Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct Receive Probation (18 U.S.C. § 3553(a)(6)).

Section 3553(a)(6) directs sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A review of the punishments meted out to defendants with similar records who have

---

F. Supp. 2d 984, 991 (E.D. Wis. 2005) (imposing non-Guidelines sentence for defendant's "otherwise outstanding character").

been convicted of similar crimes (but more significant misconduct) shows that a period of incarceration will not achieve the objective of nondisparity in sentencing.

Counsel is not aware of any existing compilation of how courts have sentenced §371 conspiracy offenders. But each year the Office of Government Ethics ("OGE") publishes a survey of prosecutions involving the conflict of interest criminal statutes (18 U.S.C. §§ 202-209). According to OGE's website (www.oge.gov), "Information on the prosecutions by U.S. Attorneys' offices and the Public Integrity Section of the Department of Justice's Criminal Division is provided to OGE with the assistance of the Executive Office for United States Attorneys at the Department of Justice." Scrutinizing the conflict of interest prosecutions is useful because the Guidelines treat the conflict of interest criminal statutes and §371 fraud offenses similarly.

The most recent survey of 2017 prosecutions (published July 2018) suggests there were only three prosecutions involving 18 U.S.C. § 208 in 2017. In one case, *United States v. James T. Shank (D. Md.),* the defendant was initially charged with wire fraud conspiracy in violation of 18 U.S.C. § 1349; receipt of illegal gratuities in violation of 18 U.S.C. § 201; and conflict of interest in violation of 18 U.S.C. § 208. Mr. Shank pled guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and was sentenced to three months of imprisonment, three years of supervised release (with the additional condition of 30 months of home detention), restitution in the amount of $1,000,000, and a special assessment of $100.

In another 2017 prosecution, *United States v. Larry Dunkin* (E.D. Ark.), the defendant was charged with violating 18 U.S.C. § 208 for awarding the contract to his wife's company, and with violating 18 U.S.C. § 1001, for making false statements to the special agent regarding her relationship to the company. In 2017, Mr. Dunkin pleaded guilty to violating 18 U.S.C. § 208. The court sentenced him to three years of probation, a $10,000 fine, and a $100 special assessment.

Lastly from 2017, in *United States v. John Nasshan* (S.D. Ca.) the defendant pleaded guilty to

one count of violating 18 U.S.C. § 208 and was sentenced to three years of probation, a $1,000 fine, and a $100 special assessment.[4]

Similarly, OGE's survey of 2016 conflict of interest prosecutions lists only two stand-alone prosecutions of 18 U.S.C. § 208: *United States v. Londra Watson* (D. D.C.); *United States v. Craig Kolhagen* (E.D. N.C.). In neither case did the district court impose a sentence of incarceration.

The bottom line is that Mr. Aman is before this Court for sentencing because he foolishly followed his supervisor's guidance. While he did something he knew was wrong, he also did so at the direction of his supervisor and while understanding that: (1) every recruit he sent to the prime contractor, MEP, could speak Farsi; (2) the population in Afghanistan also spoke and understood Farsi; and (3) every recruit sent to MEP was subjected to additional screening and training by MEP.

In its Sentencing Memorandum the government suggests that as a result of his misconduct, Mr. Aman "obtained extra bonuses . . . to which he was not entitled." *This is true*. The governments other suggestions however, that in this case the military did not get the benefit of its bargain and may have been harmed by use of unqualified interpreters, are just <u>not true</u>.

Candidates Mr. Aman (through FedSys) referred to MEP went to Afghanistan to work

---

[4] OGE's survey reports that in the *Nasshan* case:

> According to the Information, from May 2011 through at least September 2015, Mr. Nasshan had a financial interest in the business affairs of NevWest, a defense contractor. Specifically, he loaned NevWest and its CEO, Alfonso Liburd, more than $30,000. The Information states that at the time Mr. Nasshan was loaning money to NevWest and its CEO, NevWest was engaged in numerous subcontracts with SWRMC, and in his job, Mr. Nasshan was involved in administering those subcontracts. Mr. Nasshan and Mr. Liburd endeavored to conceal their financial relationship by dealing in cash when exchanging amounts over $10,000, and structuring payments into amounts of $10,000 or less. When questioned by a Naval Criminal Investigative Service agent, Mr. Nasshan stated that he did not have a financial interest in any private companies or contractors whose work he had verified, certified or recommended, and similarly told FBI agents that he did not have a financial interest in NevWest, and that he had never given any money to the company or its employees.

with U.S. Armed Forces *only* if they first passed the additional battery of tests and *only* if they

sucessfully completed the additional training MEP conducted at its Pre-Deployment Processing

Center.[5]

      Also notable is the fact that if MEP rejected linguist candidates referred to it (through Mr.

Aman's work at FedSys), Mr. Aman would receive only the initial referral bonus of $250—but

none of the other available recruiting bonuses mentioned in paragraphs 7 and 8 of the Factual

---

[5] Before completing this Sentencing Memo, undersigned counsel spoke with a former Marine who deployed ten times to the relevant combat theater and working with translators. This former Marine served with Special Operations Command and worked with the intelligence ground force soldiers to collect information. As a result, he has considerable familiarity with the Military's requirements for linguists and translators in Afghanistan. He confirmed that when candidates left FedSys's (or other subcontracts') sites, candidates would head to Maryland, to MEP's Pre-Deployment Processing Center site, for further and more scrutinizing screenings. Mr. Aman (and other first level recruiters) had one job, he explained: to set up the initial OPI screening. This former Marine explained that the Military knew the OPI had many opportunities for mischief. "The Military was not that dumb to stop there at their screenings." He confirmed that upon arrival of linguist candidates to MEP's Maryland facility, candidates would receive a ten minute in person screening of language testing done, via Skype, in a room with a proctor watching over the candidate. (Similar to a state board test taken in main centers for accreditation certificates.) During this Skype call test, the proctor would start in English and ask the candidate which languages he or she spoke: Dari or Pashto, or just one of the two. If the linguist spoke both then verbal exams were given for both. If the linguist spoke only one, *the exam scrutinized just that one language*. From this Skype exam, the proctor could, and would, identify what dialect was spoken in order to best fit the needs of the DOD. The proctors would use this dialect information for later transit detail—to decide the region where the linguist should be placed so no time would be wasted upon arrival into the war theater. One who spoke Dari would go to Dari-spoken regions. One who spoke Pashto would head to the South because Pashto was more common there. Candidates unable to speak both languages well were still sued, those unable to pass a test on one or the other language were told to pack their bags and head home. Both languages were not a requirement, but knowing at least one meant you would further process for potential deployment.

The Military also understood that linguists had differing abilities and those abilities were scored using the Army's Appendix for Language Testing and Skills System. Active military and contractors must abide by the same four-point scoring system (with CATEGORY 4 being the highest level and grade received). Usually a 4 is given to those who sit next to the highest-ranking officials and can interpret information (potentially classified information) rapidly with very strong and hard vocabulary skills. In contrast, CATEGORY 1 linguists required no Secret, Top Secret, or Top Secret/SCI clearance, and reading/writing ability was not mandatory. These might be linguists translating for those cleaning up trash. They would be paid far less than linguists able to qualify at the higher rated categories.

Basis for Plea. In every case where Mr. Aman received a higher bonus, he did so only after and because the candidates he referred to MEP's Pre-Deployment Processing Center passed the additional language tests MEP conducted of candidates there. *See* Factual Basis for Plea, ¶6.

Mr. Aman's candid conversations with investigators as part of his cooperation, and his immediate acceptance of responsibility for an offense that has not resulted in prosecution of any contractor (possibly due to the absence of any indication that the initial screening misconduct impacted military operations or spending), further warrants suspending any sentence of incarceration and imposing requirements of gainful employment and community service.

> **D.     Restitution is not Appropriate in this Case Because Mr. Aman's Former Employer Paid His Bonuses and Is Not a Victim of His Offense (18 U.S.C. § 3553(a)(7)).**

Section 3553(a)(7) directs sentencing judges to consider "the need to provide restitution to any victims of the offense." There are no victims in this case for whom restitution is appropriate; indeed, the entity that encouraged Mr. Aman to fake the qualifications of potential recruits is under investigation for having done precisely that. The government did not pay more money to its contractor, MEP, as a result of Mr. Aman's offense and the government is not seeking a restitution order from the Court.

> **E.     Given Mr. Aman's Current Financial Condition and Post-Conviction Employment Prospects, The Court Should Not Impose a Fine (18 U.S.C. §§ 3553(a)(2)(A) & (a)(3)).**

Mr. Aman has not been employed with FedSys and, as a result of the uncertainty as to when he would be sentenced and what he could tell prospective employers about a criminal case under seal, he has actively pursued gainful employment this year. Mr. Aman intends to pursue opportunities for steady employment as soon as he knows whether his sentence will interfere with his employment possibilities. Mr. Aman's economic circumstances have recently become challenging, but he continues to receive support from family and friends and he is committed to

returning to his pre-arrest status of being self-sufficient.

He will, of course, endeavor to pay a fine if so ordered and requests that he be permitted to pay any fine over time.

## VI.    REQUESTED SENTENCING

Not only would it be a punishment greater than what is required given the facts of this case, *it would be counterproductive to place Mr. Aman in custody*. A sentence of probation is authorized in Zone A and Zone B and this Court has discretion to sentence Mr. Aman as such an offender. Even if the Court were to credit Mr. Aman with merely a one-point deduction in his adjusted offense level for having provided substantial assistance to the government, Mr. Aman is, at worse, in Zone B. The Comprehensive Crime Control Act of 1984 recognizes that probation is a sentence in and of itself. 18 U.S.C. § 356. The criminal misconduct that brings Mr. Aman before this Court ended—for him—over eight years ago. He has moved on and as his cooperation and post-arrest compliance show, he remains headed in a positive direction. Incarceration at this late stage would be pointless and would only set him back. A sentence of probation (along with requirements of gainful employment and community service) is precisely what this Court should impose.

Alternatively, should this Court determine that some type of custody is appropriate, Mr. Aman respectfully requests that he be sentenced of home detention with work release so that he can pursue and again secure gainful employment. In short, for the period of home detention, Mr. Aman requests Court authorization to leave his home for employment purposes and, of course, for any community service the Court may require.

VII.    **CONCLUSION**

Based on the foregoing, Mr. Aman respectfully requests that this Court sentence him as requested above.

Respectfully submitted,

*/s/ William R. Cowden*
William R. Cowden
DC Bar #426401
WILLIAM COWDEN LLC
1750 K Street, N.W., Suite 900
Washington, DC 20006
Telephone: (202) 808-3140
wcowden@cowdenllc.com

*/s/ Eric S. Montalvo*
Eric S. Montalvo
DC Bar #993206
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, DC 20006
Telephone: (202) 862-4360
emontalvo@fedpractice.com

*Attorneys for Defendant Abdul Aman*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 11, 2019, a copy of the foregoing Defendant's Memorandum in Aid of Sentencing was served by email upon counsel for the United States.

*/s/ William R. Cowden*
William R. Cowden